If we were walking down the street inside of a book shop, handwriting is almost impossible because of the noise and the colors. It can be a gift, or a gift from God to a child. So when you side on a sidewalk, try coming in with both hands and approaching the customer in the southern direction right where the book is placed. Alright! Alright! The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning, please be seated. First case for argument this morning is 15-2082, Intercontinental Great Brands v. Kellogg, North American Company. We're ready whenever you are. Good morning and may it please the court. Katie Crosby Lehman for Intercontinental Great Brands. At the time of the invention, the company was a craft company. Now it is owned by Mondelez International. Starting with obviousness, the district court erred by using hindsight and common sense without supporting evidence to render the claims obvious. The district court found a prima facie case of obviousness based on comparing the prior combination and only then considered whether the secondary considerations rebut that finding. Counsel, did it make a finding, a prima facie finding or did it make the final conclusion on obviousness? It made a prima facie finding and then it considered the secondary considerations to see if the evidence rebuts that finding. And don't we have dozens and dozens of cases that counsel on doing that precisely the same way and isn't the pushback on our cases where there was a determination, an ultimate determination of obviousness before you look at the objective indicia but not when you go through doing a prima facie case and then consider an attentive prima facie finding of obviousness and then the secondary considerations? That's what our case law talks about, right? Well, here it was unique in that the prima facie case was based only on comparing two prior combinations. That was created by the court. If the court would have looked and treated all factors equally, the combination and the motivation to combine would not be so obvious. So it turns on the valuing secondary considerations to show that there was no simple common sense motivation to combine. I don't quite understand your answer. Are you attacking or questioning the prima facie determination of obviousness based on the combination of references? I'm doing both. Or are you just saying it's weak and therefore the secondary consideration should have carried more weight? I'm saying that the prima facie case was done without considering the secondary considerations. So if the secondary considerations would have been treated as a co-equal factor, it would not have been so obvious to make that combination. So the core of our argument is that the court used common sense to get to a motivation to combine. And none of the secondary considerations were considered when the court was making that combination. Are you saying that the analysis of motivation to combine requires or includes a consideration of the secondary considerations? I'm really just trying to understand your argument. So the court made a prima facie case before considering. Can you answer that very specific question, which seems to me at the heart of it? That is, does a court before finding, and this is a factual issue, a motivation to combine, have to consider the secondary considerations? Yes. The court should consider secondary considerations as an equal factor when making its obviousness determination. Let me try to separate things. Obviousness as a whole is a conclusion of law based on a whole bunch of facts. Motivation to combine, we've said, is a fact traditionally done in thinking about the art traditionally before one considers the non-art factors. Also lots of facts. And it's absolutely true that one cannot draw the legal conclusion of obviousness until you've considered everything. That's for us, and it doesn't really matter what the district court did, because that's a legal conclusion. But on the factual component of what we have traditionally done in the art part of the case, the prima facie case, there's a motivation to combine question, which we have said repeatedly is a fact question. Can a district court decide that fact question, here actually not decide the fact question, but decide it under a summary judgment standard, without considering the secondary considerations? No. Have we said that? The motivation to combine, you have said that the secondary considerations should all be treated equally. For purposes of the overall legal conclusion of obviousness, is that right? Have we said that in reaching the factual determination of motivation to combine, the secondary considerations must be taken into account? For a motivation to combine, the secondary considerations are often what highlight why the prior art is not so obvious, is not so common sense. So let me break it down into two things. One error is that the court decided a prima facie case, and the prima facie case was based on the motivation to combine references. That when you look at the secondary considerations, it is not so obvious. At that point, the legal conclusion of obviousness has not been made, correct? Right. So the analysis is still in progress at that point. Let me turn to motivation to combine, because I appreciate the issue that the court made a prima facie case, but not a final legal determination. The court here erred in making its motivation to combine by relying on common sense. And under Arendi, the court erred in three ways. The common sense finding was done contrary to the evidence of record. So the court decided motivation to combine was entirely based on common sense. It was logical. It was predictable. But the court did not provide any evidence as to why that was so. In fact, there's evidence to the contrary. Kellogg confronted this exact combination. So are you saying the court made a finding, a final finding on motivation to combine before going to the objective criteria? Yes. The court made a finding on motivation to combine. And that's how he reached his combination, and then considered the secondary considerations. But what he did was, I mean, he first, motivation to combine, I think traditionally, if you can tell me cases that don't do that, I'm interested, becomes part of the prima facie case of obviousness. A tentative conclusion, if you conclude that there is some level of prima facie case. And then you turn to the secondary considerations. And there's no question and there's no dispute that you have to consider those before you reach your ultimate conclusion of obviousness. It seems to me that's what the district court did here. I mean, there might be other problems, but he established a prima facie case. And then he correctly turned to and credited the secondary considerations. So you're trying to make sort of like the stage has been set wrongly, kind of a legal error in the way he considered it. And I'm not seeing it. I mean, maybe you might have an argument as to why the motivation was insufficient. And you might have an argument about why the secondary considerations should have carried the day over the prima facie case because they were so overwhelming. But is that what you're trying to say, or are you making another, a different argument? Power integration said that the secondary considerations often show that the combination was far less obvious than the prior art may suggest. Yes. So under that line of thinking, it's helpful to consider the secondary considerations when collecting the references to make the prior art combination.  And the court had no evidence to pick the different prior art references and make that combination. That combination, that motivation to combine, was only based on common sense and conclusion. Well, what motivation are we talking about? We're talking about combining, I keep forgetting. Machinery update. There were two packages in machinery update. Right, and combining that with Graham. With Graham, which is the traditional cookie package. Because the only one thing missing is the frame. The frame was missing. But remember, this combination goes to the very core, the very heart of the invention. The problem that we were facing was that cookie packages, you have to tear open the side and pull the frame out. Right. This invention was a significant and revolutionary change on that. Because rather than accessing the cookies by pulling the frame out horizontally, now you can access the cookies vertically. But why is that in any, I'm going to use a non-legal term here, significant way, different from accessing the sushi or I forget what the other thing was, meats? Was there salamis or something? The salamis were sliced meat. They were stacked or shingled with no frame. And so think of a bacon package. And so you would access the food that way. In the sushi, it was a very shallow tray. And so there was no frame. And the claims require the frame to protect the cookies and elevate the wrapper. Right. But why isn't, I gather that the prior art, I think this is accepted. Tell me if I'm wrong. The prior art recognized that there was this problem. I mean, probably everybody in this room knew the problem of tearing the damn package and not being able to close it and then the cookies get stale. It's a terrible problem. I mean, it really is. So once you have machinery update or even packaging news, it's kind of counterpart saying, here's a way to access the food and reseal it really easily, including in one instance in a little shallow frame. I guess we can't really call it a frame, but a shallow tray. How is, what's left but to say, oh, there's a problem. Here's a solution. So the tray, we need one with higher edges. Go ahead. We have actual evidence here that Kellogg had all that information, rejected it, considered it for its cookie packages and rejected it. That is evidence that it was not common sense. It was not believable. There is evidence that Kellogg was skeptical. So a year, less than a year before the patent was filed, Kellogg went to Germany to a trade show, obtained a Fuji package, brought it back, kept it confidential to Kellogg and had a meeting with five packaging engineers. At that meeting, it was considered to use that resealable label for cookie packages. It was rejected, discarded. They never used the technology. They then considered many options. This was not even one of those options. This is exactly the situation where it seems today that it's commonsensical, but when you look back at what happened at the time, it's not common sense. Why does that little episode with Kellogg support an inference that Kellogg didn't see the technological point as opposed to didn't see that it was worthwhile economically? Well, we can look at what happened today, too. So at that time, we're evaluating whether it's common sense and predictable. And so Kellogg's treatment, they were looking for a solution to the cookie package. They were presented with the resealable label adding to a traditional cookie package, and they rejected it. And these are packaging engineers looking for the solution. So they have knowledge of the problem, trying to solve it, and they couldn't solve it. If it was so commonsensical and predictable, they would have used it then. It didn't even make their list of considerations on a go-forward basis. This is not a situation where we have one or two solutions. We have tin ties. We have zipper strips. They could be on the top. They could be on the sides. It could be a container. You could have a lid. There are many different options, and the option had to be cost-effective and acceptable to consumers. Kellogg rejected that idea within one year of the patent being filed. Also, look at the secondary considerations. They're incredible here. Crafted a one-to-one comparison. So on the secondary considerations, is it your argument that the court made a legal conclusion as to sufficiency of summary judgment without adequately considering factual issues raised by the secondary considerations? Yes, specifically as to motivation to combine. So in reaching its conclusion of motivation to combine, the court had no evidence. So that's why you keep going back to the motivation to combine. The district court found a motivation to combine based on common sense, whereas here's all this other evidence, backed by expert testimony, that goes directly to that issue. And that's part of the secondary considerations, or the objective indicia, let's say. And that was that power integration case that I cited that oftentimes you look at the You're getting caught up in this argument as to the prima facie case. And I realize that there's a dispute going on about that. But I think this court is pretty clear that you cannot reach a legal conclusion on obviousness without consideration of the objective indicia. And it seems to me that the court did that, looked at the objective indicia before making that final legal conclusion. The question I have is whether the objective indicia was given sufficient weight. And here it's argued it was not. Okay. Well, you're well into your rebuttal, so why don't we hear from the other side. Thank you. Your Honors, Counsel, may it please the court, with or without the KSR, even pre-KSR, the court in this particular case found a strong, striking case of obviousness. Counsel, let me bring up like an administrative issue. Certainly. Have you looked adequately at the word count of your brief, your red brief? He certified a 1,400 word count, more or less, 1,494. And my word count is over 18,000 words in your brief. And I'd like for you to take a look at that particular issue and report back as to the adequate word count and what we should do about that. It's not a question of having a couple hundred or 50 words, but when we're talking about several thousand, and also take a look at the very end of the brief. I'll point the pages. Just look at page 71 and 72, especially 72. You have arguments there, and you make a statement, and then you refer us to numerous pages in the record as if to say, here's my position, now you, court, go find it. And there's no argument. There's no analysis there. It's just citations back to the, and I'm kind of concerned about that. It's your job to state your position fully and thoroughly before this court, and I don't like to see this type of argument. It's not an argument. I understand, Your Honor. We will do that. We'll address both the page count, the word count, as well as what apparently happened in those pages. All right. I thank you, Counselor, for that. We will get back to it. If we could do that within, say, five days, would that be all right for the court? Yes. Thank you, Your Honor. Getting back to the objective considerations that the court relied upon, this was a case of strong issues of invalidity in the areas of obviousness. Why don't you address specifically your friend's argument with respect to motivation? Be glad to, Your Honor. First of all, at the very outset, this court, Judge Conelli, ruled the exact same way in addressing a prima facie case of obviousness as just about every other court that's had to address that issue before considering the fourth prong of the John B. Deere analysis. But with regard to motivation, here's what we've got. We've got two elements on this purported incredible invention. We've got an existing 50-year-old cookie bag, a flow-wrapped cookie bag, that's been around forever, and I'm a big cookie fan myself, Your Honor. That was a problem that was well known, getting into the bag, getting out, and keeping things fresh, as it has been for other food products. You've got that on prior art. This product was not, the prior art that was combined with that cookie bag, was not some obscure piece of equipment or some package that was being used to address nuts-and-bolts packaging somewhere in some industrial complex somewhere. This was being marketed, and the court has seen three separate magazine articles, the two machinery update articles, as well as the packaging news, the one with the misprint, three separate articles back in late 2001 and early 2002, long before this purported invention, that was geared with trade shows. Long before that? It was a year before it became an invention. I would actually think that the closeness in time is rather important to discounting the objective considerations, rather than if it was long before and still nobody was doing it, that really helps craft. Well, actually, Your Honor, when I say long before, I'm talking in terms of months. It was a long-felt need that one then noticed until, by the way, both Kraft and Kellogg attended trade shows where the actual packages were shown and samples were given. One of those samples is the subject of a cross-appeal. The problem, though, of freshness, of opening up a package of cookies and not having to take them all out and reseal them in another container or something, that had existed for quite a long time, hadn't it? It had, Your Honor. However, 11 months, 10 1⁄2, 11 months before the trade show, that both parties were at and saw this equipment. Before that, we had three articles come out. One of them was seven months before. The other two were from late 2001, about 10 or 11 months before. And in those articles, rather than being in some obscure piece of prior art in some warehouse or some plant somewhere, these particular articles address what it takes to keep your food fresh in the way of discrete food products. And by the way, one of the pictures, the third one, the 2002 machinery update, shows a tray, but the court did not consider anticipation here. But ignoring that, they talk about what it takes to make something reclosable. In essence, a ceiling layer, a flap, that's adhesively attached to the top of a pre-perfed package that when you pull it back, it either opens it or if there's a separate hole. What about your friend tells us that you were well aware of that and Kellogg was and Kellogg rejected it? That's not the case, Your Honor. While both companies were aware of this technology out there, Kellogg simply did not go ahead and attempt to put it together. It ends up that Kraft had their plastics supplier go ahead and put together. They had a vendor actually design it for them. Kellogg did not. It was just a choice of who was going to jump into it and who was not. But this particular invention was designed for the whole world and primarily the food market to utilize to keep product fresh. It described exactly what to do to put it on your existing packaging. The whole concept is if you're using FlowRap for a wrapper, this will work on FlowRap. Get back, please, to the Kellogg saw this, decided not to go forward with it. Why does that not communicate something of evidentiary significance about why, in fact, this really wasn't an obvious solution to a well-recognized problem? Your Honor, simply, Kellogg's and Keebler are not nearly as big and do not have as sophisticated plastic suppliers and design vendors as Kraft had at the time. Kraft is making Oreo and Chips Ahoy. Sandy's, Pecan Sandy's, and things of that nature are much smaller brands. There was not justification for going ahead with the design. So what happened is… We are, and I guess I do want to actually ask you about this. We're on summary judgment here. One of the things that I found actually mystifying about your brief is that you 15 times or something invoke the clear error standard, clearly erroneous. I don't understand what that standard or review is doing in this case. This is on summary judgment. To put it another way, the district court did not make any factual findings. The district court found that the record would not support certain factual findings. That's correct, Your Honor. What is this clear error standard doing throughout your brief? That should not be posed. In this case, the court found that there were no material issues of fact remaining. Everything was conceded or known. The only thing that wasn't conceded was whether or not there was this motivation, and the court found strong motivation. So get back to the Kellogg sees the technology and decides not to use it episode. Why is it not the case that there are two stories to tell, one on each side about whether that's significant or not? You have your story and they have their story. The problem is that both stories revolve around the fact that this product, this addition to the prior art, whether it was in the notion of common sense or not, was there, and it was being shown and marketed to at least craft an IGB, the larger of the cookie companies, to put in with their product. It was there expressly for the purpose. And, in fact, one of the articles, the 2002 article, says as a preface to the disclosure of the sealant. If there's two stories that we're dealing with here, and each story has a factual basis to it, and there's different conflicting stories, and we're dealing with summary judgment, why doesn't that tell me that there's a genuine issue material fact? You raise a good fact. There are two stories about who decided to jump ahead with it and who didn't. That's one story. The story here, however, is whether or not it was obvious to one of skill in the art, and the fact that one party went ahead with it and another party waited and didn't and ended up using something different to avoid any potential patent infringement, that's a completely separate story. So if we go with that story and take a look, if we look at that story, the latter one that you just raised, and we think about that in terms of motivation to combine. And the court says common sense, and the objective indicia indicate otherwise, indicate long-felt need, industry applause or recognition, and other aspects of objective indicia. Don't we have battling facts there? Aren't those facts situated contrary to each other? There is an argument between the parties as to, gee, who was wiser going ahead and using it first? Why does that argument not go to the jury? Because the fact is that looking at the claims, looking objectively at the claims of the inventions here, and not who made a business decision to jump with it and who didn't after seeing it at a show, that's inconsequential. The question is whether the claims are obvious or not. And that is the question that the court found overwhelmingly supported a finding of a prima facie case of obviousness, which after considering, and the court spent three or four pages going through the issues of secondary consideration, one by one checking them off. I don't understand. Did the court find that the facts that favor you was overwhelming superior or just overwhelming facts on the other side? No. What the court found was the court looked strictly at the invention. The court looked, obviously, at the secondary considerations, although I have to tell you, Your Honor, this is the first time I'm hearing today that one of the factual considerations, excuse me, one of the secondary considerations was who went into it first. That is news to me here today. They went into sales. They went into skepticism. They went into things like that. But who went into it first I think is being raised for the first time today. But what the court looked at before it looked at any of the secondary considerations, the court looked at the claims after properly construing them and looked to see exactly what the prior art disclosed and saw what everyone in this courtroom could see, that there are two things that were being combined there where the one, the additional aspect of what was disclosed by the Fuji Resila technology was made specifically to apply to that very bag that was being used. It was an overwhelmingly strong case that supported the prima facie finding of obviousness. Then the court went back and carefully looked at all the secondary considerations that the court must do under a proper Graham v. Deere analysis. And only after doing that did the court reach its conclusion. Whether or not a business decision was made on the basis of who's selling the most cookies and whether to make an investment on that, that was something that I don't think the court had before, number one. And number two, that was something that the court looked at solely and exclusively after the court looked at the patent itself. The court spent all its time on the patent of obviousness. Can I interrupt you to switch topics on two things? One is, why is there not a factual issue on literal infringement for the following reason? I can't think of a reason that the little collar that you guys put under the opening is not part of the top. Okay. If it was part of the top, then you would have the top sealing to the top, which can't be done. No, you have the flap, or what do you call that, extra layer or something, sealing to the top, sealing in fact to the collar. Here was our concern with that part, Your Honor. Number one, the court made it clear from its claim construction, and the court repeated again in its opinion, that the fact that the accused structure did not have a sealing layer, it's only got one layer on top, was a material difference from what's described in the claim. Okay. You're running out of time, so let me ask you. The inequitable conduct. Yes, Your Honor. Do we need to decide that if you win on validity? We believe that... It's a counterclaim, so unfortunately for that purpose, it's not just an affirmative. We believe that you do, Your Honor. We believe that we're entitled to a hearing on the issues. And if I can go back for just one quick second, when the court looked at the doctrine of equivalence, it did so on the basis of completely ignoring the all elements rule. It just said, well, these products both keep things fresh and everything. It didn't go element by element. Nor could it, because the number one element was a material element. There is no immaterial or insubstantial equivalence to it. It's a material distinction over what was listed in the claim. Getting back to inequitable conduct, on that particular case, Your Honor, we believe, from Kellogg's perspective, that the court considered the inferences to be drawn against Kellogg. Kellogg did not bring the motion. It was brought by Kraft, IGB. And yet the suggestions that, well, this could be explained away, perhaps there was a reasonable explanation for this or that and everything, in view of all of it. I'm sorry, Kraft brought what motion? IGB is the party that brought the motion for summary judgment on the issue of inequitable conduct. They wanted summary judgment of no effect. That's right. And yet the inferences were held against the non-moving party. It was the exact opposite of how it should be, and we believe that we should have an opportunity to do this. On the intent element, which in the inequitable conduct world has a kind of super high standard. That's correct, Your Honor. That's correct. But in this case, in view of five to seven things that occurred here, not just some shrug of the shoulder, gee, the patent office had a copy of the typo, the misstated document. They could have read it and everything. That pales in comparison to what was actually done here with regard to representations to the administrative law judges at the PTAP. When they asked, wait a second, this looks like a wrapper around it, and they're told, no, no, that's not a wrapper. In view of those things, we believe that Kellogg is entitled to a hearing on inequitable conduct. I have another question here, and this goes back to the summary judgment. It seems to me, or at least your opponent is arguing, that the court made a construction of ceiling layer, made one construction at the Markman hearing, and then applied a different one at summary judgment. Can you address that issue? During claim construction, the court said, look, the ceiling layer has got to be a separate layer. Now, there has since been embodiments. At the Markman? At the Markman claim construction, that's correct. He said it's got to be a separate layer. But whether that layer is laminated to another ply, whether it's laminated, for example. Did he say it's got to be a separate or distinct layer? It's got to be a distinct layer. He didn't say separate. I mean, and that's the point of dispute here. He said separate later. But at Markman, he said distinct, didn't he? He said it's got to be a distinct layer. I just wanted to make sure of that. Actually, you raise a good point. He said at Markman it's got to be a distinct layer. But he also noted, even at the Markman, and he repeated again in his opinion, that it could still, nonetheless, be laminated to the top of the wrapper, so that they can come together. But you can't seal one to the other if they're one and the same. Now, during the briefing, there was another suggestion to say that the court said it could be a different type of material as opposed to a distinct or separate material. The court said type of material. Could it be a different plastic? Could it be a non-fluorite? Could it be something else, a patch that's laid out like the label in the original embodiments? He said it could be made of a different type of material. But he didn't say that it could be the same exact material. He was talking in the context of what it was made out of. He said it had to be separate. He said it had to be a distinct layer. It could be laminated, though. Well, let's get clear on this, because you've offered two different arguments here. At Markman, the conclusion was that that sealing layer was a distinct layer. Then later, at summary judgment, the district court ruled that distinct sealing layer was separate, that distinct meant separate. Now that you've pointed it out, I believe that the court was using them interchangeably. It has to be a separate layer of material. Whether or not it's bonded to it, that's laminated. It's still a separate, distinct layer. He didn't mean, the court didn't mean separate as, oh, no, it's got to be separated across the entire congruent area. The court is simply saying it's got to be two distinct layers of material, whether they're laminated or not. Didn't the issue of infringement actually fall on the question of whether the two layers are separate, meaning not together? No. As opposed to distinct? No, no. I believe the way the court looked at it in the language, my recollection of the language from the court, is the fact that it's got to be a distinct layer. The top of the wrapper is one layer of material, the one that goes around the flow ramp material. The other material has got to be a different, here I'll throw a third word, distinct, separate, different piece of material, because it has to adhesively attach to the top of the layer. Now, there are embodiments, more recent embodiments invented by others, where the ceiling layer and the top of the wrapper, in fact, are laminated to each other, and how they're cut enables what happens in the pullback. But there's still distinct layers, whether or not they're laminated, and the court caught that in both the Markman claim construction ruling as well as in the court's opinion in this case.  Thank you. Thank you, Your Honor. So let's do six minutes to even up the time. Starting with obviousness, I just want to address two fact issues. It was stated that Kellogg, excuse me, Kraft, knew of the Fuji package from the 2001 Interpac packaging show and knew about it all along. That's not true. That's not supported by the evidence. No one involved in the invention knew about that Fuji package in 2005. Then it had a new label. It was investigated and believed to be new as of 2005. People in Germany for a division of Kraft may have attended the show, but they also do not have recollection of seeing the package in 2001. The idea that Kellogg is a smaller brand and something about the packaging companies going forward or not going forward, that's not supported by the evidence. Kraft hired an independent consultant who came up with a whole entire book of ideas, also did a conference at MIT where about 100 ideas were presented. Snack and Seal, the invention at issue, rose to the top. That's how Kraft invented it. Third, going to evidence of skepticism, A5196 is a Kellogg PowerPoint that highlights fact issues related to this motivation to combine and secondary considerations. What's the date of that? Well, that's okay. I can find it. I have just the page. I don't have the first page. It's A5196. And in this PowerPoint... The earlier page has a July 6, 2005 date. I can check on that and certainly report back to the date of the PowerPoint. Here it highlights the issue that we discussed, that the package, consumers would rebate it, and people were skeptical. It was not believed to be reliable for Snack and Seal. Kraft testing also showed low believability at A5324, and the 36 witness for Kellogg testified to skepticism at A6342. Now turning to infringement, on Markman, the court said that sealing layer must be distinct but need not be, quote, physically separated from the top of the container or more specifically from the wrapper that forms the top of the container, A45. Quote, in other words, distinct and separate have different meanings in this context. End quote. If we look at the claims, the claims determine and they are dispositive of how to construe sealing layer. The sealing layer needs to do very specific things. First of all, the sealing layer must seal against the top to close the access opening. The key there is overlap. There are also other factors that are not raised by this, which includes the starter portion. You have to be able to grab it, then access and put your hand in, and then it's reclosable. The first element of sealing layer should be dispositive. There is no requirement that the sealing layer be physically separate. The claims are not limited to any certain manufacturing process as to how to make a sealing layer. The construction improperly limits it to the preferred embodiment, which did use an adhesive labor as sealing layer. That does not mean that that's required by the claims. In fact, physically separate sealing layer reads out the Oreos, which was one of two embodiments shown to the PTO during the reexamination. Oreos makes the sealing layer by multilayered laminate. It uses a laser cut to cut the sealing layer from the top and a laser cut to cut the access opening from the bottom. This allows the sealing layer to open and close, overlap with the top of the container, which is anything that remains flat, and perform all functions of the sealing layer. There's no requirement for it to be physically separate. So this bottom layer, these two layers of laminate, the bottom one acts as a collar, as Toronto was, I think, pointing out earlier. Is that the collar? That would be what Kellogg uses as the collar. That's where it seals to the top. What Kellogg did was rather than using a physically separate adhesive label as was done in the preferred embodiment, they used a physically separate collar that adhered to the top. That shrunk the size of the access opening, thereby allowing the sealing layer to adhere. So again, the sealing layer must overlap with the top. They can do this in many different ways depending on how it's manufactured. The claims are not limited to any style of manufacturing. On inequal conduct, if the issue is so clear that Packaging News has a typo, Packaging News and Machinery Update were both in front of the examiner. In fact, Regath, the owner, Regath Works of McFarland and Fuji, they're the ones who make all these Fuji embodiments, the subjects of the articles. If it was so obvious, why didn't they correct it? They never corrected it with the PTO when they did their third-party request for reexamination. There was no correction publicly. If it was so obvious, the examiner had all the information in front of them. Under Fisker and Avery-Denison, an applicant cannot be guilty of inequitable conduct if a reference was cited to the examiner, whether or not there was rejection on it, and the prior art disclosed is the content is presumed to be before the examiner. All of the content of Machinery Update and Packaging News were before the examiner. There cannot be any inequitable conduct. I thought at least part of their inequitable conduct case was that at several points, you all emphasized the particular language without conventional film? Wrapping film. And there is just no plausible basis for believing that that was anything other than a mistake? We disagree with that context. What is the plausible basis for thinking that it in fact lacked conventional wrapping film? Three things. The photograph does not show film going over the sides. If you compare the photograph from Machinery Update to Packaging News, one is a pouch where you can see that it's a bag, and one is not. You can't see the film going through. And in fact, the article says that that package was made without the expense of plastic profile. What does that mean if it doesn't mean that the plastic does not go all the way around to the sides? That still stands. This package does not have the expense of plastic profile. And also it says without conventional wrapping film. The typo comes from comparing two different articles with two different photographs and different content. The sentence might be the same, but the overall context of the articles are different. Both the Moncayo, the lead inventor, and attorney Birmingham explained that they never recognized a typo. They read both articles independently for what they stood for and addressed the rejections by the examiner based on the articles referenced. The third-party requester had briefed and did extensive claim charts on both of these. Thank you. Since we covered inequitable conduct, we'll give you one minute to respond. Thank you. Your Honors, there are three publications that are involved here. If the court looks at the packaging news article, it sees a picture of a person with a fork picking out discreet food articles from a tray and a bag. If the court looks at the other machinery update, it sees the exact same picture, except it's in color in the ones we've got. With regard to that, not only... I mean, we hear the argument that the examiner, the board... Did you all... you were the requester, right? No, we're not, Your Honor. Who was? I believe a company affiliated years ago with Fuji releasing those books. Okay, and did the requester... the requester presented all three of these articles? Two of them. Two of them, but one of them packaging news? One of them was packaging news. And did the requester say, notice that these are actually different? One says X and the other says not X? The requester did not catch it, no. Doesn't that suggest that it's reasonable to believe that maybe the lawyers and others who said they didn't catch it either? What would... No, no. We actually took their deposition. They admitted that they knew about the difference. There was notation that they had one of their paralegals do research on contradictions between the references, the pieces of prior... whether there was an obligation to disclose it. We cited that in the record, Your Honor. And they knew what the differences were, and yet they rode that difference to patentability on reexamination. It's not just a case where these two things came in. The examiner, the reexamination examiner missed it. The other attorneys missed it. But the folks at Kraft at the time, they knew about it. They knew about the difference, and they had research conducted on what their obligations were to disclose it. And then they rode that distinction all the way up to patentability. Thank you. Thank both sides, and the case is submitted. Thank you, and we will get back to the court within five days. Thank you.